UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Joseph T. Noonan

     v.                             Civil No. 11-cv-517-JD

Michael J. Astrue, Commissioner
of Social Security Administration


O R D E R

    Joseph T. Noonan seeks judicial review, pursuant to 42
U.S.C. § 405(g), of the decision of the Commissioner of the
Social Security Administration, denying his application for
disability insurance benefits and supplemental security income.
Noonan contends that the Administrative Law Judge ("ALJ") erred
in failing to consider all of his impairments when assessing his
residual functional capacity and erred in finding that Noonan's
subjective complaints were not fully credible.  The Commissioner
moves to affirm the decision.


Background

    Joseph T. Noonan applied for disability insurance benefits
and Supplemental Security Income on April 30, 2009, alleging a
disability onset date of November 10, 2008.  Noonan was thirty-
two years old when he applied for benefits and had a General
Educational Development ("GED") diploma.  He had worked
sporadically as a mechanic during the nine years preceding his
application.  Noonan contends that he is disabled due to mental

health issues and physical limitations caused by carpal tunnel syndrome, shoulder bursitis, back pain, and problems with his hip joints.

A.   Medical Evidence

Noonan saw his family practitioner, Dr. Melissa Hanrahan, in October of 2008 for bilateral hand pain.  Noonan also told Dr. Hanrahan about increased anxiety and trouble sleeping.  Dr. Hanrahan prescribed Trazadone, Effexor, and Klonopkin for anxiety and referred Noonan to Dr. Clingman, an orthopedic surgeon, because of his hand pain.  After medication did not provide relief of the hand pain, Dr. Clingman did bilateral carpal tunnel surgery in November of 2008.

Post surgery, Noonan's hands improved.  In March of 2009, Dr. Clingman found that both of Noonan's wrists and hands had normal examination results.  Noonan reported that he could hammer and do push ups but that using an air gun made his right hand tingle.  Dr. Clingman recommended that Noonan use power tools to gradually desensitize the nerve in his hand.  In April, Noonan told Dr. Clingman that his left hand was perfect but his right hand still had symptoms although he was able to hammer nails and split wood with only minimal problems.  Dr. Clingman thought that scar adhesions in the carpal tunnel were causing "traction neuritis" in the right hand.

In May of 2009, Noonan was injured in a car accident, suffering a right hip dislocation and a displaced femoral head fracture.  Dr. Alexander Hennig, an orthopedic surgeon, did closed reduction surgery to repair the fracture.  Ten days later, Noonan reported left shoulder pain, and examination showed reduced strength and pain when lifting his arm.  In June, Noonan told Dr. Hennig that he still had soreness and muscle tightness in his hip and some pain in his left shoulder.  On examination, Dr. Hennig found that while sitting in his wheelchair Noonan had sixty degrees of flexion in his hip, that sensation and strength were intact in his right leg, and that his left shoulder had no limitation in range of motion.  An MRI of Noonan's shoulder was consistent with a muscle bruise and a possible tear of the superior labrum.  Noonan's strength was normal but he had pain with resisted lifting.  He was scheduled for physical therapy for his hip and shoulder.

Noonan told Dr. Hanrahan in July of 2009 that his depression was a little worse but he did not need an adjustment of his medications.  Dr. Hanrahan thought Noonan was doing well under the circumstances.

In August of 2009, Noonan reported to Dr. Hennig that he was gaining motion and strength in his right hip and had minimal pain.  He was using a cane for assistance in walking.  He also said that his left shoulder pain had improved dramatically.  On examination, Dr. Hennig found that Noonan walked with a limp, had

110 degrees of flexion in his hip without pain, and had a full range of motion in his left shoulder without pain.  Later that month, Dr. Clingman noted that Noonan's left hand had recovered from carpal tunnel surgery but that the right hand had persistent symptoms probably due to scar entrapment around the nerve.

At an appointment in October of 2009, Noonan told Dr. Hennig that he was doing quite well, that he had returned to walking and light cycling, that he had almost no hip pain, and that his left shoulder pain had improved.  On examination, Dr. Hennig noted that Noonan walked without a limp, that he had a good range of motion and full strength in his hip, and that x-rays showed full healing of the fracture and a properly located hip.  Dr. Hennig told Noonan that he could begin more aggressive biking and could begin light jogging in about a month and a half.  He was discharged from physical therapy.  When Noonan reported increased hip pain in November, Dr. Hennig diagnosed bursitis and prescribed physical therapy.

Noonan also had an appointment with Dr. Hanrahan in November of 2009, when he told her that his hip pain was worse in the morning but did not require medication.  He said that he was not sleeping well, which happened every fall, and was taking Excedrin for headaches.  He said that his current medication was managing his panic disorder.  Because Noonan had a depressed affect, Dr. Hanrahan suggested that he find a new therapist.

4

Noonan also saw Dr. Clingman in November and reported that he had recently developed tingling in both hands, had been having frequent headaches since the car accident, and had frequent but not severe neck pain.  On examination, Dr. Clingman found that Noonan had a full range of motion in both wrists and the fingers of both hands.  Compression over the nerve at the right wrist crease and the median nerve caused some discomfort but not tingling or numbness.  X-rays showed some cervical disc narrowing but normal bone structure.

On November 12, 2009, Ernie R. Downs, Ph.D., did a consultative psychological evaluation of Noonan as part of Noonan's social security application.  Noonan told Dr. Downs that he had been depressed and had had anxiety since his brother died in 1999.  Noonan cried almost constantly through the evaluation but remained cooperative and on target.

Dr. Downs found that Noonan was fully oriented and appeared to have normal intelligence.  Noonan reported that his long-term memory was intact, that his short-term memory was "garbage", and that he could not concentrate well enough to watch television or read.  In response to testing, Noonan was able to recount events from the day before, identify bordering states, repeat a five-digit number and a four-digit number backward with one error, did serial seven subtraction slowly but accurately, and was able to recall two out of three events after a two-minute delay.  Dr. Downs concluded that Noonan could understand and remember

5

instructions, interact appropriately, communicate effectively, sustain attention and complete tasks, make simple decisions, maintain attendance and schedule, and interact appropriately with supervisors.  Dr. Downs also noted that Noonan might have a bipolar disorder, rather than depression, based on his reported history.

Noonan began counseling sessions with D. Patrick McGuinness, MA, LCMHC, in December of 2009.  Noonan reported increased anger and irritability since his car accident, along with headaches, concentration problems, and memory loss.  In January of 2010, McGuinness noted Noonan's depressed and anxious mood and sad affect.  He said that Noonan's wife was supportive, that Noonan tried to complete chores and tasks despite his physical and mental challenges, and used planners to help him cope. McGuinness also noted that Noonan's angry outbursts had caused problems with his family.  McGuinness assessed Noonan's global functioning, GAF, at 48, which indicates serious symptoms or serious difficulty in social, occupational, or school functioning.

Dr. Hugh Fairley, a state agency physician, reviewed Noonan's medical records in December of 2009, and evaluated his physical residual functional capacity.  Dr. Fairley found that Noonan could do work activities at the light exertional level, could occasionally stoop, crouch, and crawl, could never climb

ladders, should avoid handling very hot or cold objects, and should avoid working at heights.

In January of 2010, Dr. Martin, a state agency psychologist, reviewed Noonan's records and found there was insufficient evidence of a medically severe mental impairment.

In March of 2010, Noonan told Dr. Hennig that his hip and thigh pain had improved significantly, that he had been quite active, and that he was walking for exercise. Dr. Hennig noted that Noonan walked without a limp and had excellent motion. Noonan told McGuinness that he had bought a car by trading in some of his guns at the urging of his wife because of an episode of "decompensation" with "some passive suicidal ideation." He also said that he had significantly improved with medication.

Noonan went to the emergency room at Franklin Regional Hospital in April of 2010 because of acute back pain after bending over to pick up a bag from the floor. He was examined by Dr. Lange who diagnosed acute lumbar strain. Dr. Lange released Noonan to rest at home with pain relievers and muscle relaxants.

At his counseling session in April, Noonan told McGuinness that bankruptcy problems were causing him increased stress. Noonan said that his wife was attacking him about the situation and that he was looking for work despite doctors' orders. Noonan also explained that he would not get disability benefits if he were discovered to be working.

Noonan saw Dr. Hennig in May and said that he still had significant back pain when sitting and had not recovered full strength and balance.  On examination, Dr. Hennig found that Noonan had excellent right hip motion and stability, full strength in the right leg, slightly increased pain on right straight leg raising, and no pain on left straight leg raising. X-rays showed no problems.  Dr. Hennig thought Noonan's reported pain might be caused by a herniated disc.  At his appointment with McGuinness, Noonan reported guilt about not working and had a melancholy affect, anxious mood, and poor energy.

Noonan also saw Dr. Clingman in May and reported that his headaches had returned along with neck tightness and arm discomfort.  Dr. Clingman found that Noonan had some lower cervical spine tenderness without spasm; good range of motion in his neck; radicular arm pain with compression of the upper plexus; full range of motion in the shoulder, elbow, wrist, and hand; the same grip strength in both hands, and normal sensation and circulation.  Dr. Clingman prescribed a home traction kit.

In June of 2010, McGuinness completed a form that indicated Noonan had mild difficulties with hopelessness and impulsivity; moderate difficulties with anxiety, energy, depressed mood, family relationships, irritability and mood stability, and sleep; and severe difficulties with physical health and work. McGuinness assessed GAF at 52 which indicates moderate symptoms or moderate difficulty in functioning.  McGuinness also noted

that Noonan demonstrated increased impulsivity, increased blunt speech, increased self-esteem, and increased irritability, along with decreased sensitivity to the feelings of others.  In July, Noonan reported that he was having increased marital problems and that friends had reduced their contact with him because of his agitation and mood swings.  In August, Noonan reported a driving incident that had upset him and a family incident with his stepdaughter.  In October and November, Noonan reported issues arising from contact with his mother and father.

In December of 2010, McGuinness completed a form for the New Hampshire Department of Health and Human Services for limitations due to post-traumatic stress disorder caused by his May 2009 car accident.  McGuinness indicated that Noonan had moderate difficulties in maintaining attention and concentration for extended periods, sustaining routine without frequent supervision, and making simple work-related decisions. McGuinness also indicated that Noonan had moderate to marked limitations in remembering locations and procedures and in remembering and understanding simple instructions.  He found that Noonan had marked limitations in maintaining pace, drive, and displaying anxiety.

At his counseling session with McGuinness in December, Noonan said that he had been granted full custody of his son.  He reported increased problems with his wife and a return of nightmares, hypervigilance, and startle responses.  At the end of

the month, McGuinness did a mental status evaluation that Noonan had good concentration and attention, bright affect, stable mood, and good energy.

In February of 2011, an MRI showed that Noonan had degenerating discs with small herniations at L4-5 and L5-S1 but with no spinal stenosis or foraminal encroachment.  Noonan told a nurse that even taking three Percocet, more than prescribed, did not help with his pain.  He was advised not to take that much Percocet and to use the steroidal anti-inflammatory medication instead.  The same month, Noonan told McGuinness that he did not want to use pain medication and was taking less than had been prescribed.  Noonan first reported better family circumstances and then at a later appointment reported increased problems.

Noonan saw Dr. Clingman in March of 2011 for pain radiating from his lumbrosacral region down his left leg and severe spasms in his central back area.  Dr. Clingman noted that Noonan leaned to the right while sitting and found tenderness in the lumbosacral and sciatic regions of his back.  Straight leg raising increased back and thigh pain although Noonan had no motor, sensory, or circulatory deficits.  Dr. Clingman recommended epidural steroid injections.

Following the appointment, Dr. Clingman completed a "Medical Source Statement of Ability to Do Work-Related Activities (Physical)."  On the form, Dr. Clingman indicated that Noonan could lift and carry up to ten pounds occasionally, sit for up to

two hours at a time for three to four hours in a work day, stand
for one hour at a time for a total of four hours, and walk for
one hour at a time for a total of three hours.  Dr. Clingman
indicated that Noonan could not finger, handle, or feel with his
right and but could do that continuously with his left hand.  His
ability to push and pull depended on the weight.  Dr. Clingman
said that Noonan should never climb ladders, stoop, or crouch but
could climb stairs, balance, and kneel occasionally.

In March of 2011, APRN Lois Hollow completed a "Medical
Source Statement of Ability to Do Work-Related Activities
(Mental)."  Hollow indicated that Noonan had marked limitations
in all areas of mental functioning.

B.  Hearing

A hearing before an ALJ was held on April 12, 2011.  Noonan
was represented by counsel and testified at the hearing.  A
vocational expert also testified.

Noonan testified about his living situation, his work
history, his medical history, and his current physical and mental
impairments.  He said that he had continuous numbness and
tingling in his right hand and sporadic problems with his left
hand including two numb fingers.  He said that he took Percocet
for pain but that it clouded his mind and affected his memory.
He said that although his hip had healed, the movement in his
hips and legs had not improved and that he had back pain which

11

was not controlled by medication.  Noonan said that he could not
run and that his ability to stand depended on the weather.

Noonan also testified about his mental health, saying that
he had suffered from depression since his brother died and that
he began to have increased sadness and anxiety after the car
accident in 2009.  He said he had memory problems and used a
planner to remember appointments.

The vocational expert testified in response to hypothetical
questions posed by the ALJ.  The vocational expert testified that
a person who could do work at the light exertional level but
could use his right hand only occasionally, could do postural
activities only occasionally, and had to avoid extreme heat and
cold could do unskilled light occupations.  When the ALJ limited
the person to sedentary work, the vocational expert testified
that he could do unskilled work such as order clerk, information
clerk, and credit authorizer.

C.  Decision

The ALJ issued his decision on April, 22, 2011, finding that
Noonan was not disabled.  The ALJ found that Noonan had severe
impairments due to surgery on his right hip, left shoulder
bursitis, degenerative disc disease of the cervical and lumbar
spine, bilateral carpal tunnel syndrome, asthma, post-traumatic
stress disorder, and bipolar disorder.  Despite his impairments,
the ALJ found that Noonan retained the functional capacity to do

sedentary work except that he must avoid climbing ladders and scaffolding, could only occasionally do postural activities, could only occasionally do feeling and reaching with his right hand, and must avoid extreme cold and heat.  The ALJ also found that Noonan could understand, remember, and complete simple, routine, and repetitive tasks without fast-paced production requirements with only simple work-related decisions.  He was also limited to occasional superficial interaction with co-workers and the public.

Based on that residual capacity, the ALJ found that Noonan could do unskilled sedentary work such as an order clerk, information clerk, and credit authorizer.  As a result, the ALJ concluded that Noonan was not disabled.  The Appeals Council denied Noonan's request for review, making the ALJ's decision the final decision of the Commissioner.

## Standard of Review

In reviewing the final decision of the Commissioner in a social security case, the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  § 405(g).  "Substantial evidence is more than a scintilla.  It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." Astralis
Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62,
66 (1st Cir. 2010).

Disability, for purposes of social security benefits, is
"the inability to do any substantial gainful activity by reason
of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months."  20 C.F.R. §§ 404.1505(a).[1]  The ALJ follows a five-step
sequential analysis for determining whether a claimant is
disabled.  § 404.1520.  The claimant bears the burden, through
the first four steps, of proving that his impairments preclude
him from working.  Freeman v. Barnhart, 274 F.3d 606, 608 (1st
Cir. 2001).  At the fifth step, the Commissioner determines
whether other work that the claimant can do, despite his
impairments, exists in significant numbers in the national
economy and must produce substantial evidence to support that
finding.  Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

---

[1]The Social Security Administration promulgated regulations
governing eligibility for disability insurance benefits at Part
404 and for supplemental security income at Part 416.  Because
the regulations are substantially the same, the court will cite
only to the disability insurance benefits regulations.  See
McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120
n.1 (1st Cir. 1986).

<u>Discussion</u>

In support of his motion to reverse the Commissioner's decision, Noonan argues that the ALJ erred in assessing his residual functional capacity and in assessing his credibility. As a result, Noonan asserts, the decision is based on error.  The Commissioner moves to affirm the decision.  Because the credibility assessment could affect the residual functional capacity assessment, credibility is addressed first.

A.  <u>Credibility Assessment</u>

Noonan contends that the ALJ improperly failed to credit his testimony about the severity, persistence, and limiting effects of his symptoms.  Citing Social Security Ruling ("SSR") 96-7p, Noonan argues that the ALJ improperly over-emphasized medical reports about his activities which should have been discounted because they were inconsistent with Noonan's hearing testimony and the remainder of the medical evidence.  The Commissioner argues that the record supports the ALJ's finding.

"The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987).  SSR 96-7p provides a two-step process for

15

evaluating a claimant's subjective symptoms, that is, the claimant's own description of his impairments.[2]  Id. at *2.

The ALJ is directed to first decide whether there is an underlying impairment that is shown by medically acceptable diagnostic techniques and could be expected to cause the claimant's symptoms.  Second, if such an impairment is found, the ALJ must evaluate the intensity, persistence, and limiting effects of the impairment or impairments.  At the second step, the claimant's credibility is assessed based on consideration of several factors:  the claimant's daily activities, functional restrictions, non-medical treatment, medications and side-effects, precipitating and aggravating factors, and the nature, location, onset, duration, frequency, radiation, and intensity of the pain.  See 20 C.F.R. § 404.1529(c)(3); Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986).  While the ALJ is expected to consider all of the relevant factors, he need not explicitly analyze each in the decision.  Wenzel v. Astrue, 2012 WL 2679456, at *7 (D.N.H. July 6, 2012).

Noonan agrees that the ALJ properly found underlying impairments at the first step.  He contends, however, that the ALJ erred at the second step by improperly evaluating the intensity, persistence, and limiting effects of his impairments. Noonan argues that the ALJ should have accepted his testimony about the severity and effects of his impairments.

---

[2]Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (July 2, 1996).

The ALJ explained that Noonan's description of the severity and effects of his impairments was not consistent with the record evidence of his "rather active life style."  The ALJ noted that after carpal tunnel surgery in November of 2008, Noonan was riding a mountain bike in April of 2009, despite swelling and reduced grip strength in his right hand.[3]  Noonan was unable to use pneumatic tools with his right hand, but he was able to pound nails and split wood.  The medical records show that his left hand recovered completely by August of 2009, although his right hand had persistent symptoms.  The ALJ included limitations due to carpal tunnel syndrome into the residual functional capacity assessment, by limiting the use of the right hand, despite finding limited evidence of ongoing problems.

With respect to the effects of the car accident in May of 2009, the ALJ noted that the medical records showed that Noonan did well and tolerated activity, including returning to light cycling and walking for exercise by October of 2009.  The ALJ summarized subsequent medical notes that show Noonan's continued improvement through complete healing of his hip and fracture, walking without a limp, and the doctor's release for him to begin cycling more aggressively and do light jogging.  The ALJ also discussed Noonan's shoulder bursitis that improved by August of 2009 despite using crutches.  He also noted Noonan's back pain,

---

[3]Noonan challenges the ALJ's mention of mountain bike riding because it occurred before his car accident.  The ALJ's analysis, however, pertained to Noonan's ability to use his hands which apparently was unaffected by the accident.

the medical findings, and the recommendation of steroid
injections.  The ALJ then analyzed the medical opinions and made
findings consistent with Dr. Clingman's opinion, except for the
postural limitations.

As such, the ALJ considered Noonan's subjective complaints
in the context of the record evidence as a whole and concluded
that he was not credible as to the severity and effects of his
impairments.  Although Noonan interprets the record differently,
because the ALJ considered appropriate evidence and made findings
supported by the record for his credibility determination, it is
entitled to deference.


B.  Residual Functional Capacity

A residual functional capacity assessment determines the
most a person can do in a work setting despite his limitations
caused by impairments.  20 C.F.R. § 404.1545(a)(1).  The
Commissioner's residual functional capacity assessment is
reviewed to determine whether it is supported by substantial
evidence.  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955
F.2d 765, 769 (1st Cir. 1991); Pacensa v. Astrue, 848 F. Supp. 2d
80, 87 (D. Mass. 2012).

Noonan contends that the ALJ's residual functional capacity
assessment is not consistent with the record evidence because the
ALJ did not give appropriate weight to the opinions of his
treating medical and mental health providers.  Specifically,
Noonan argues that the ALJ should have given controlling weight

18

to the mental health opinions of his therapists, McGuinness and
Hollow, instead of to the opinion of the state agency consultant
psychologist, Dr. Downs.  He also argues that the ALJ should have
adopted the entire opinion of Dr. Clingman.

The ALJ attributes weight to a medical opinion based on
factors including the nature of the relationship between the
medical source and the claimant, the extent to which the opinion
includes supporting information, the consistency of the opinion
with the record as a whole, the specialization of the source, the
source's understanding of the administrative process, and the
source's familiarity with the claimant's record.  20 C.F.R. §
404.1527(d); see also SSR 96-2p, 1996 WL 374188 (July 2, 1996).[4]
Only acceptable medical sources can give medical opinions, can be
considered treating sources, and can establish the existence of a
medically determinable impairment.  20 C.F.R. §§ 404.1502,
404.1513(a), & 404.15276(a)(2); SSR 06-3p, 2006 WL 2329939, at *2
(Aug. 9, 2006)[5]; Taylor v. Astrue, --- F. Supp. 2d ---, 2012 WL
5195969, at *4 (D. Mass. Oct. 22, 2012).  The ALJ may give weight
to the opinions of other health care providers, who are not

---

[4]SSR 96-2p is titled Policy Interpretation Ruling Titles II
and XVI:  Giving Controlling Weight to Treating Source Medical
Opinions.

[5]SSR 06-3p is titled Titles II and XVI:II and XVI:
Considering Opinions and Other Evidence from Sources Who Are Not
"Acceptable Medical Sources" in Disability Claims; Considering
Decisions on Disability by Other Governmental and Nongovernmental
Agencies.

acceptable sources, and cannot ignore such opinions.  Id. at *5
(citing SSR 06-3p).

1.  Mental Limitations

Noonan faults the ALJ for failing to adopt the opinions
about the severity of his mental impairments provided by his
therapist, D. Patrick McGuinness, MA, LCMHC, and by APRN Lois
Hollow, and for relying instead on the opinion of the
consultative psychologist, Dr. Downs.  He also asserts that the
ALJ erred in failing to adopt Dr. Clingman's opinion about his
physical residual functional capacity.  The Commissioner contends
that the ALJ properly assessed the medical opinions.

Noonan's therapists, McGuinness and Hollow, are not
acceptable medical sources.[6]  § 404.1513(a).  Dr. Downs is an
acceptable medical source who based his opinion on his
examination and evaluation of Noonan.  The ALJ noted the opinions
of McGuinness and Hollow and stated that they are not acceptable
medical sources.  The ALJ gave Hollow's opinions that Noonan had
marked limitations in all areas little weight because they were
inconsistent with the treatment records, with most of
McGuinness's opinions, and with Dr. Downs's findings of less
severe limitations.  The ALJ gave McGuinness's opinions of
moderate limitations in most areas and moderate to marked

---

[6]Although Noonan refers to Hollow as a treating therapist,
the only medical record cited from Hollow is the "Medical Source
Statement of Ability to Do Work-Related Activities (Mental)" that
she completed in March of 2011.

limitations in the ability to understand and remember short simple instructions some weight.

The ALJ assessed Noonan's mental residual functional capacity in accord with Dr. Downs's findings and most of McGuinness's findings.  Therefore, the ALJ properly assessed the source opinions and substantial evidence supports the mental limitations in the ALJ's residual functional capacity assessment.

### 2.  Physical Limitations

The ALJ relied on the opinion of Dr. Clingman as to Noonan's physical limitations with one exception.  Dr. Clingman found that Noonan could never stoop, crouch, or crawl, but the ALJ found that Noonan could occasionally do postural activities.  Noonan argues that the ALJ erred because no medical opinion supports his finding that Noonan could occasionally stoop, crouch, or crawl.

The ALJ acknowledged that Dr. Clingman indicated that Noonan could never stoop, crouch, or crawl.  He explained that he did not accept that part of Dr. Clingman's opinion because the record showed that Noonan was capable of physical activities that included mountain biking, cycling, and jogging.  Although the ALJ did not accept much of Dr. Fairley's opinion of Noonan's limitations, Dr. Fairley did find that Noonan was capable of occasionally stooping, crouching, and crawling.

The opinions of a nonexamining medical source are considered based upon the same factors as are used to weigh the opinions of other medical sources.  § 404.1527(e)(2)(ii).  The ALJ disagreed

with Dr. Fairley's opinion that Noonan was capable of doing light work but accepted Dr. Fairley's limitations as to climbing and environmental factors.  The ALJ did not explicitly accept Dr. Fairley's opinion about Noonan's ability to stoop, crouch, and crawl, which would have been the better procedure.  Nevertheless, Dr. Fairley's opinion is consistent with the record evidence that the ALJ cited, pertaining to Noonan's physical activity, and provides substantial evidence to support that part of the ALJ's residual functional capacity assessment.

### Conclusion

For the foregoing reasons, the plaintiff's motion to reverse the Commissioner's decision (document no. 14) is denied.  The Commissioner's motion to affirm (document no. 18) is granted.  The Commissioner's decision is affirmed.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

November 26, 2012

cc:  Timothy P. Beaupre, Esq.
     T. David Plourde, Esq.